421 So.2d 370 (1982)
B. OLINDE & SONS CO., INC. d/b/a Baton Rouge Beer Agency
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION & DEVELOPMENT; Iberville Parish Police Jury; and Tidelands Equipment, Inc.
No. 15106.
Court of Appeal of Louisiana, First Circuit.
October 12, 1982.
Writ Denied December 10, 1982.
*371 Joseph B. Olinde, Baton Rouge, for plaintiff-appellant B. Olinde & Sons Co., Inc., D/B/A Baton Rouge Beer Agency.
Daniel R. Atkinson, Baton Rouge, for defendants and third party plaintiffs-appellants Tidelands Equipment, Inc., and Maryland Cas. Co.
Paul H. Spaht, Baton Rouge, for defendants and third party defendants-appellees L. H. Bossier, Inc., Alexandria Const. Co. and Reliance Ins. Co.
Robert J. Jones, James C. Russell, Jr., Baton Rouge, for defendant-appellant and third party plaintiff State of La., through the Dept. of Transp. and Development.
Before LOTTINGER, COLE and CARTER, JJ.
LOTTINGER, Judge.
This is an action ex delicto arising from a one-vehicle accident occurring on Louisiana Highway 75 in Iberville Parish. A beer truck owned by plaintiff overturned while traversing a section of the highway being resurfaced and widened. Suit was filed against the State through the Department of Transportation (DOTD), and against various contractors, subcontractors, and their insurers.[1] From judgment in favor of the defendants, dismissing plaintiff's claim and all third-party claims, plaintiff has appealed.[2]

FACTS
From the briefs and the record, we glean the following:
The accident in question occurred on August 27, 1979, at about 1:30 p.m. Plaintiff's employees, John Staid and Elton York, were on their normal delivery route, traveling northward on Highway 75 between Pigeon and Bayou Sorrell in a beer truck owned by plaintiff. The driver, John Staid, encountered an area where the highway was being resurfaced. The highway in the area of the accident had been ripped up and graded, soil cement had been "cut" into it, and oil emulsion had been sprayed, but the final layer of asphalt had not yet been laid. The roadbed and shoulder area were one level plane, with oil emulsion covering the roadbed but overlapping in places onto the side of the road. The weather was overcast, and Staid testified that light mist covered the roadway, a precursor to rain. As the beer truck rounded a small curve, Staid observed another truck approaching in the opposite direction. Staid moved his vehicle to the right to make sure there was room enough to pass. The right wheels of the truck left the hard roadbed and went onto an area which would normally compose the road shoulder. Staid testified that due to the presence of oil emulsion and moisture, the overcast conditions, and the state of resurfacing, he was unable to distinguish where the hard roadbed ended and the shoulder began. When the right wheels of the truck left the roadbed, the shoulder gave way beneath the truck's weight. A collapse of the shoulder area caused the truck to list toward the right, slide down a short slope, and overturn into the underbrush. The right wheels of the truck were about one foot from the road proper when the shoulder area collapsed.
Staid and York were not seriously injured in the accident but underwent medical treatment. The beer truck, however, was severely damaged, with the cargo area of the truck being totalled. Plaintiff filed suit under theories of negligence and strict liability, *372 asserting the following items of damages: property damage to the truck, wrecker fees, costs incurred in salvaging the ruined truck body, medical bills for Staid and York, lost wages paid directly by plaintiff to York, and damages for beer lost when the truck overturned.

TRIAL COURT
Much testimony at trial dealt with the factual issue of whether the shoulder area was visually distinguishable from the hard roadbed. The trial court found as fact that the roadway and shoulder were distinguishable on close inspection, but that it was doubtful the driver of a vehicle could make the same distinction.
The trial court found that the driver of the beer truck made a manuever to the edge of the road which was not necessary, and that the driver knew the road was under construction. The court found that the contractors had complied with the requirements of the DOTD and the road was properly posted with warning signs. Because the road was under construction, the trial court distinguished Rue v. State Dept. of Highways, 372 So.2d 1197 (La.1979), wherein the Supreme Court held the Department of Highways liable for a deteriorating shoulder even though the driver was found to be contributorily negligent. For these reasons, the trial court found defendants not to be liable, and dismissed plaintiff's suit at its cost.

SPECIFICATIONS OF ERROR
Plaintiff-appellant, B. Olinde & Sons, Inc., d/b/a Baton Rouge Beer Agency, assigns the following specifications of error:
1. The trial court erred in not applying the theory of strict liability.
2. The trial court erred in finding the driver of plaintiff's vehicle guilty of substandard conduct of such nature as to bar plaintiff's recovery.
3. Though the trial court's determination as to the posting of "soft" or "low" shoulder signs is not clear, the trial court erred if it found that such signs were posted at the time of the accident.
4. The trial court erred in not admitting into evidence hospital bills paid by plaintiff.
5. The trial court erred in not admitting into evidence proof of lost wages paid by plaintiff.

ROAD SURFACING
A review of the processes involved in road resurfacing is in order:
First, the old roadway is ripped up, and the resulting subgrade leveled and compacted.[3] Second, the cement stabilized base is put in place. This second stage is also termed "cutting in the soil cement." Third, the soil cement or stabilized base is "cured" or "primed." Curing or priming the soil cement involves spreading a thin layer of oil emulsion over the stabilized base in order to seal it from moisture. Fourth, the asphalt itself is put into place. Finally, the fifth stage is to bring in the shoulder materials and put the shoulder into place. The accident which is the subject to this lawsuit occurred between the third and fourth stage of construction, right after the oil emulsion was spread on the stabilized base, but before the asphalt or shoulder materials were put in place. Thus, what is referred to as a collapsing "shoulder" was not in reality a shoulder, since the new shoulder materials were not yet in place. The roadway was not only being resurfaced but also widened, and speculation at trial was that the existing road shoulder was partially destroyed and was buried under and overlapped by dirt and other materials moved to the road side during grading of the roadbed, prior to the "cutting in" the soil cement. This is what actually collapsed beneath plaintiff's truck when the right wheels left the road.

UNREASONABLE RISK OF HARM
In the case sub judice, plaintiff claims liability both under La.Civ.Code art. 2315 *373 for defendants' failure to correct a hazardous condition of the road shoulder, and under La.Civ.Code art. 2317, as interpreted in Loescher v. Parr, 324 So.2d 441 (La.1975), for damages caused by a "defective" thing in the custody of the defendants. In Jones v. City of Baton Rouge-Parish of East Baton Rouge, 388 So.2d 737 (La.1980), the Supreme Court delineated the standard for liability under art. 2317 as follows:
"Because the responsibility for preventing the unreasonable risk of injury to others is unconditional, the injured party seeking damages under article 2317 need not prove that any particular act or omission on the part of the defendant caused his injuries. He must only prove that the thing which caused the damage was in the care or custody of the defendant, that the thing had a vice or defect  that is, that it occasioned an unreasonable risk of injury to another  and that his injury was caused by the defect." 388 So.2d at 739
Recently, in Kent v. Gulf States Utilities Company, 418 So.2d 493, the Louisiana Supreme Court made the following observations on the relationship between negligence and strict liability in Louisiana law:
"In a typical negligence case against the owner of a thing (such as a tree) which is actively involved in the causation of injury, the claimant must prove that something about the thing created an unreasonable risk of injury that resulted in the damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk, and no responsibility is placed on the owner who acted reasonably but nevertheless failed to discover that the thing presented an unreasonable risk of harm.
"In a strict liability case against the same owner, the claimant is relieved only of proving that the owner knew or should have known of the risk involved. The claimant must still prove that under the circumstances the thing presented an unreasonable risk of harm which resulted in the damage (or must prove, as some decisions have characterized this element of proof, that the thing was defective). The resulting liability is strict in the sense that the owner's duty to protect against injurious consequences resulting from the risk does not depend on actual or constructive knowledge of the risk, the factor which usually gives rise to a duty under negligence concepts. Under strict liability concepts, the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody. If the owner breaches that absolute duty to discover, he is presumed to have discovered any risks presented by the thing in custody, and the owner accordingly will be held liable for failing to take steps to prevent injury resulting because the thing in his custody presented an unreasonable risk of injury to another.
"Thus, while the basis for determining the existence of the duty (to take reasonable steps to prevent injury as a result of the thing's presenting an unreasonable risk of harm) is different in C.C. Art. 2317 strict liability cases and in ordinary negligence cases, the duty which arises is the same. The extent of the duty (and the resulting degree of care necessary to fulfill the duty) depends upon the particular facts and circumstances of each case.
"Accordingly, in a strict liability case in which the claimant asserts that the owner's damage-causing thing presented an unreasonable risk of harm, the standard for determining liability is to presume the owner's knowledge of the risk presented by the thing under his control and then to determine the reasonableness (according to traditional notions of blameworthiness) of the owner's conduct, in the light of that presumed knowledge." (emphasis added by the Supreme Court; footnote omitted)
*374 Thus, under negligence or strict liability analyses plaintiff must prove that the damage-causing thing posed an unreasonable risk of harm. Under either analysis, when determining whether the risk of harm is unreasonable, the court must balance the utility of the thing against the probability of the risk of harm and the magnitude of the harm which may ensue. Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980).

BALANCE
Initially, we note that this court in a recent case, Duffy v. State through Department of Transportation and Development, 415 So.2d 375 (La.App. 1st Cir.1982) refused to hold the state strictly liable for damages caused by a build-up of gravel formed during grading of a gravel road. This court noted that to apply strict liability to hazards temporarily occasioned during road repairs would place the state in a "Catch-22" or "no-win" situation whereby the state would be liable in negligence or strict liability for a failure to properly maintain a roadway, but would be also strictly liable for injuries caused as a result of the attempt to repair. The only way the State could escape liability in such cases would be to completely close highways to traffic during repairs.
Mindful of the rationale of Duffy, we must determine whether the temporary road shoulder constituted an unreasonable risk of harm under all the facts and circumstances of the instant case. For purposes of this inquiry, we shall assume that no signs specifically warning of soft shoulders were in place, as is argued by plaintiff.
Trial testimony revealed that the driver, John Staid, had traversed the highway under construction regularly for a period of several weeks prior to the accident. The highway contained signs alerting the public that the area was under construction. That Staid was extremely familiar with the highway and the progress of construction tended to lessen the probability of an accident such as the one which occurred, inasmuch as a driver who regularly observes a road being resurfaced will become wary of the road shoulder, which usually will be affected concomitantly.
Staid testified that he was unable to distinguish the location of the edge of the road due to overcast conditions and the presence of oil emulsion and moisture. However, testimony of others who observed the highway at a later time revealed that under ordinary road and weather conditions the shoulder was easily distinguishable, a fact which lessened the probability of the accident.
The beer truck involved in the accident was quite large and loaded with cargo, weighing more than 33,000 pounds. Plaintiff's expert drove his smaller passenger vehicle over the shoulder to determine where it became dangerously soft. The smaller vehicle did not cause the temporary shoulder to appreciably break or give way. Although the highway was open to all traffic, the facts indicate that the hazard existed only in relation to very heavy and large vehicles, which we assume is but a percentage of those on the highway. Again, the probability of this type of accident is lessened.
Finally, the record reveals that in the normal process of road resurfacing, permanent shoulder materials are brought in, graded and compacted after the final layer of asphalt is laid. There is no indication in the record that the project was delayed or was not proceeding on schedule. Thus, whatever hazard was present existed presumably for a short time only. This fact distinguishes the instant case from those cited by plaintiff, Edwards v. State Department of Transportation & Development, 403 So.2d 109 (La.App. 3rd Cir.1981), writ den. 407 So.2d 733 (La.1981); and McDaniel v. State, Department of Transportation and Development, 398 So.2d 88 (La.App. 3rd Cir.1981); writs den. 404 So.2d 277 and 279 (La.1981). In Edwards and McDaniel, a large drop-off between new asphalt and the shoulder was allowed to exist for periods of two and four months respectively, due to the lags in the resurfacing process. The existence of the hazards for a period of months increased the probability of an accident; thus, an unreasonable risk of harm was thereby created. However, in the instant case, the process of blading and rolling the roadway was completed August 7, *375 1979, less than one month before the accident.
Considering the above, we find that the probability of this particular risk of harm was small.
However, the magnitude of the possible harm was undoubtedly high. Neither of the passengers in the beer truck was seriously injured; we attribute this fact to a fortunate turn of events. One involved in this type of accident, caused by a collapsing temporary road shoulder, could easily be seriously injured or killed.
Nonetheless, there was a high utility factor involved in keeping the highway open during repairs. Highway 75 is the only road in this area of Iberville Parish, near the Atchafalaya Basin. All residents of the area depend on the highway to travel to work and between residences. To have closed the highway during repairs would have worked a hardship on a large number of persons.
As was stated in Kent, supra, the fact that a defendant has custody over a harm-producing object relieves a plaintiff suing under La.Civ.Code art. 2317 from proving the defendant's actual or constructive knowledge of the risk of harm. Such knowledge is imputed to the defendant, and the basis for liability under Art. 2317 (like under a negligence analysis) is the reasonableness of the defendant's conduct. Because La. Highway 75 was in the custody of the defendants, whether they had actual or constructive knowledge of the risk of a collapsing temporary road shoulder is of no moment.
Our task is, then, to determine whether the defendants' actions or lack thereof in attempting to prevent the risk of harm were unreasonable under traditional notions of blameworthiness, Kent, supra. We have determined that the probability of this type of accident was low, as enumerated above.[4] Additionally, the highway under repair was the only state highway serving an isolated part of Iberville Parish. Although the probability of the risk may have been lessened even further by attempting to compact the temporary shoulder more or by providing road delineators or more specific warning signs, after having balanced the already low probability factor against the high utility value of Highway 75, we do not find that the defendants' conduct was unreasonable under the circumstances. The process of resurfacing the highway was reasonably safe despite the occurrence of the unlikely truck accident which did occur. The defendants are therefore absolved of liability.
In light of the above holding, we expressly pretermit discussion of contributory negligence (or "victim fault") and the evidentiary issues presented in plaintiff's specifications of error numbers four and five.
Therefore, for the above and foregoing reasons, the judgment of the trial court dismissing the main demand and all third-party demands is hereby affirmed. All costs are assessed to plaintiff-appellant.
AFFIRMED.
NOTES
[1] Also made parties defendant were the Iberville Parish Police Jury; Tidelands Equipment, Inc., the prime contractor on the reconstruction job; Maryland Casualty Company, Tidelands' insurer; Alexandria Construction Company, a subcontractor; L.H. Bossier, Inc., a subcontractor; and Reliance Insurance Company, insurer of Alexandria Construction and L.H. Bossier. The State filed a third-party demand against Tidelands. Tidelands and its insurer filed a third-party demand against Alexandria Construction and its insurer. The Iberville Parish Police Jury was granted summary judgment prior to trial on the grounds that it was in no way responsible for Highway 75, a state highway.
[2] The State and Tidelands have also appealed to preserve their third-party claims in case of reversal on the main demand.
[3] The record indicates both the roadbed and the shoulder area are compacted, but the shoulder area usually receives less attention than does the roadbed during this stage.
[4] The fact that Staid had driven the highway regularly during the entire construction period weighs significantly in our determination that the probability of the risk was low. See Duffy v. State Department of Transportation and Development, 415 So.2d 375 (La.App. 1st Cir.1982).